Good morning, Judge Hawkins, Judge Collins, Judge Murphy. May it please the court. My name is Lee Phillips. I'm an attorney in Flagstaff, and I'm here representing the family of the Webb family. My client originally was Laura Many Goats, but unfortunately, she's passed away. And so her son, Brandon, and two other sons of hers are bringing this case, seeking the benefits that their mother had been attempting to qualify for prior to her death. This is a head of household case. Residency is not an issue. This is a situation where Laura Many Goats, her sister, Nora Many Goats, their older sister, Martha Many Goats, all applied for relocation benefits at different times. The mother, Cora Many Goats, and their father, Key Many Goats, they all resided in the coal mine chapter of the Navajo Reservation, which would be the far western part, and they lived in the Sand Springs community, which was about an hour and a half from Tuba City to the east. They were subsistence farmers. They subsisted on livestock that they raised and sold and ate. The women primarily, which is common on the Navajo Reservation, are typically involved in crafts and primarily involved in weaving rugs, Navajo rugs, which are considered quite special and are sold frequently at all of the tourist locations, the Grand Canyon, Sedona, Flagstaff, the Museum of Northern Arizona in Flagstaff. And those places were where Nora, Laura, and Martha sold their rugs. So my understanding is that one of the issues is that Martha and Laura both said that they made rugs that were similar, but they had very different estimates of the price of the rugs. Can you address that issue? Yes, Your Honor. Martha is the oldest, and she had the first hearing. And when we went to hearing in her case, she had been denied, head of household. She did not speak English. She spoke only Navajo. So we used an interpreter. She was legally blind. She had no ability to drive. She had no driver's license. And so the rugs that she wove were typically much smaller and much more simple in design. Laura's rugs were considerably larger and of a much finer quality. And as a result, while the oldest sister, Martha, was able to sell rugs for $40, $80, $100, her two younger sisters were able to sell rugs for up to $300 or $400. And so Laura was at that, I'm sorry, excuse me, Martha, at our hearing. She testified. We had no documentation for any of her income. And the hearing officer raised the issue of the fact that she lacked documentation, and that raised the question of whether she was credible or not. But after the testimony, at the close of the testimony... These were transactions that occurred 30 years ago? Yes, sir. These were transactions that would have occurred in the 1980s. And so at the end of the hearing, the attorney for the agency advised the hearing officer that he was persuaded by Martha's testimony, and that he was going to recommend that she be certified. And she was, in fact, certified and did receive relocation benefits. Several years later, Laura graduated from high school in 1984 in Tuba City. And she had a sister, Nora, who was two years older than she was. They graduated, or they went to Tuba City High School. Laura graduated. Nora left at the 11th grade. And in the following year, 1985, both Laura and Nora were recruited by their sister-in-law to apply to a technical school in Flagstaff that was using the name at that time Arizona Academy for Medical and Dental Assistance. And that was located on the east side of Flagstaff. The sister-in-law was a student at that time there. So she took Laura and Nora in the fall of 1985 to the school. They applied. They filled out two applications, one for financial aid, one for tuition. And that was all done through this academy. Later, we find out that academy was determined to be ineligible because it was not certified, not accredited. It wasn't, in fact, a real school that had any supervision from the state or federal government. But it operated for several years here in Flagstaff. And Laura and Nora started school September of 1985. There were problems because the hearing officer identified at least some specific issues with the testimony. One is that they said the school went bankrupt and closed. And the hearing officer pointed to evidence indicating that that wasn't true. And then the second issue was that the state maintained some records for the school going back into the 80s for, you know, purposes of people to be able to verify their education. And there's no records of her in those. Why is it not substantial evidence to say that those kinds of problems are a basis for the hearing officer to reject the testimony? It's not credible. Well, in the investigation that we did, and the agency was also involved, we learned that the academy that was run by a man named David Schrader had, in fact, closed in March of 86. And two subsequent similar named, slightly different named technical schools opened in the same building over the next several years. Ultimately, College of America took over all of the records of those two later schools. But because Mr. Schrader's school was not actually an accredited school, they had no records. So they'd never received any records. In fact, College of America informed us they had never had any records provided to them. The explanation you've just given before the hearing officer? Yes, we had emails, we had letters. Yes is enough. I'm sorry. Thank you, Judge. So, again, so what happens is 85, they start, they break it in December for the holiday break. They return to 1986 in February to the academy. And at that time, they're advised that the academy has financial difficulties and is, according to the sisters, going to declare bankruptcy and was going to close earlier than the original date of May when they should have graduated. And, in fact, they went back to school in February. In the beginning of March, the school closed. And at that point, the sisters returned to the reservation. They attempt to make contact with Mr. Schrader to try to get transcripts, records. What's the point of all this? The hearing officer found, as I understand it, that Laura was not a head of household, even though she testified she made $15,000. And I'm assuming that's the basis of the appeal of his decision, correct? Partially. How does this tie in to the fact that her credibility was found suspect by the hearing officer and that she was indeed not the head of household qualifying for benefits? Well, I'm sure you are aware, but let me just explain from our perspective. The agency had recognized from the very beginning that the lifestyle of the reservation was very different for the Navajo people. There was no economic development, no banks, no companies. So most of the traditional Navajo families, they survived by subsistence livestock, rugs, and trading rugs oftentimes for food and groceries at the trading post. I'll be honest with you. I just have one or two specific questions. Maybe we can talk about them now. With regard to the rugs, one of the things the hearing officer found was that your client's testimony about the amount she made was not credible and not corroborated by other evidence. And so that's one of the findings on which he based his unfavorable ruling and determination. And I just wonder, wouldn't you expect to have $15,000 of income from rugs, some sort of billing record, some sort of tax return, some sort of information that could help corroborate the testimony she's trying to give? Because it was important. Yes, Your Honor, but the problem is that nobody on the reservation at that time frame had any sort of organized payroll. They had no pay stubs. They were paid in cash because there were no banks. They had no bank accounts, no checks for the most part. So as a legal matter, then wasn't the hearing officer entitled to say, I can't believe this testimony because we have to look to these types of things, including corroborating evidence, and we don't have it? Well, Your Honor, we had corroborating evidence. We had the initial testimony of the older sister, Martha, which they found credible. Their parents had testified at Martha's hearing, and the hearing officer found them to be credible. She told basically the exact same story that Nora and Laura did, the only difference being because of her disability, the value of her rugs weren't as high. But the fact is that we also had this corroboration. We had the fact that there was records of this school being on 7th Avenue and Flagstaff before it went out of business. And Mr. Schrader and his financial officer who handled all the financial aid for the students, because it was a scam, and what it was was they'd bring these Navajo students in. They'd have them fill out applications for financial aid from the Navajo tribe or from the federal government. They'd send that in, and again, they both filled out two applications, $5,000 for living expenses, $5,000 for tuition. And Mr. Schrader, after he closed his business, continued to operate this scam until 1997 when he pled guilty to a 32-count indictment where he pled guilty to three student loan fraud charges, was sentenced to 21 months in prison, and was assessed a restitution. How does that show that your client was self-supporting? Well, because my client testified, her sister testified, that they had received, they had applied for $5,000 financial aid, $5,000 for tuition. They testified that Laura, when she received that $5,000 for living expenses, she purchased a Nissan truck here in Flagstaff, which she and her sister used to commute from Flagstaff to the reservation. And it was basically just testimony. And again, many of these cases, I mean, these are events that took place 30 years ago or more in situations where there were almost never any financial records, no Social Security withheld in these situations. These were cash transactions. Both daughters explained and identified a number of locations, museums, and other places where they would take and sell the rugs, cash, or on the reservation they frequently would set up stands on the highways and tourists would stop and buy paying cash because they didn't have credit cards at that time, no computers, it was nothing like that. And so all we had in many of our cases, including the older sister, was just their testimony. The only difference that I can even remember in the hearings was that Martha actually brought one of her rugs to the hearing and showed it to Mr. Murkow. Do you want to save some time for rebuttal? Yes, Judge. And can I ask you when you come back up for rebuttal to be prepared to give me the page sites of where it says that the school closed and then subsequently reopened? Because that's what I understand you said that you submitted. I'd like to be sure I'm looking at that when you come back up. Yes, sir. Thank you. Thank you. We'll hear now from Mr. Arbab. May it please the Court, Mr. Phillips, John Arbab for the Office of Navajo and Hopi Indian Relocation. I agree with Mr. Phillips that this is a head of household case, as he said at the beginning of his argument, but I'm afraid I disagree with pretty much everything he had to say after that. The issue here is whether Laura Manygoats was self-supporting, a self-supporting head of household, in July of 1986, and she bore the burden of proving that before the hearing officer. And the hearing officer considered all of the testimony and the documentary evidence and came to the conclusion that she was not self-supporting. He concluded her credibility was lacking as well. That's true, Your Honor. Would you agree with me that the hearing officer's justification for the credibility finding was rather thin? I would not agree with that, Your Honor. I think it was quite robust. Are you familiar with a case called Soce v. OHNIR? I'm somewhat familiar, Your Honor, yes. That's a case where the circuit sent back to the hearing officer a very similar case involving lack of documentation for rug weaving and sails in a very similar situation. Why shouldn't we do that? Your Honor, if I'm remembering the Soce case correctly— To me, I just have to confess, I grew up on the edge of the Navajo Reservation. I went to high school and college with members of the Navajo and Hopi tribe. I'm very familiar with Indian traders and rugs. It is a stunning lack of appreciation for Navajo culture to say that you're going to say someone is incredible because they don't have records, documentary evidence, of rug sails that occurred 30 years ago. What's your response to that? I appreciate your point, but that wasn't the sole reason that the hearing officer found the rug weaving testimony. It was certainly one of them. It was one of them, but even putting that aside, there was just inconsistent, confusing testimony on the rug weaving point. They were all trying to describe what their mother did, right? No, there was testimony about what their sister Martha did. In Martha's case, I think it's quite interesting that Martha, who was certified, was able to come forward with affidavits. She didn't have documentary evidence of the sails per se, but she did have an affidavit from her parents describing— traditional Navajo rug weaving and sails can be justified simply on the basis of a lack of documentation. I would say no, because the agency does not have a per se rule that lacking documentary evidence, we will find your testimony not credible. You can certainly make out, as Martha was able to do in her case, you can make out a case of how much you made by weaving rugs, which was how many you sold, and to show that that total amount showed that you were a self-supporting head of household at the time. But that evidence was lacking here. The testimony from Laura and her sister, Nora, before the hearing officer was completely setting aside the lack of documentary evidence. It was just not reliable, and the hearing officer explained quite thoroughly why that was. As we point out in the red brief, there wasn't consistent testimony about how much Laura sold her rugs for. There was not consistent testimony about how many she sold while she was a student at the Arizona Academy. At least she claimed that she was. What was the issue with the passage of time? The hearing officer found the passage of time supported her lack of credibility. I think that was another ground on which he made his credibility finding. Your Honor, I don't recall that the hearing officer put much emphasis on the passage of time. I would point out that although some time had, I think about 28 years had passed, between the time of the rug sales and attendance at the Academy and the administrative hearing, it's also the case that Laura could have applied for benefits at any time before that and did not. And if she had earlier on and had been denied, then the pattern in all of these cases is that upon initial denial and the filing of an administrative appeal to be heard by the hearing officer, the Navajo Nation makes arrangements for the applicant to have legal representation and so on. And that's what happened here. Mr. Phillips has been representing Ms. Many Goats and now her family ever since the administrative hearing before the agency. Can I ask you the same question I asked your opposing counsel, which is what does the record show about whether the school did in fact close and reopen or just sort of continue to operate but change names? My understanding from the record is that the school, the school did not actually close. And that was one of the problems with Laura's testimony. She and her sister insisted that the school had abruptly closed without warning in March of 1986. But the hearing officer pointed out to counsel that there is this body in Arizona known as the Arizona State Board for Private Post-Secondary Education and kept the record open so that the parties could investigate and come up with any evidence of closure or non-closure. And it turned out that the Arizona Board had no record of this school actually closing. And the parties also put before the hearing officer, very interesting to my mind, excerpts from the Flagstaff phone book for the years after 1986, the alleged closure. And all of those phone book records show that the school was still at least being listed in the phone book as being open for business in the late 1980s and into 1990. Your opponent said that the hearing officer was told that it operated under the same name, notwithstanding this fraudster who opened it in the first place, took all the money and ran off. With respect, Your Honor. Did the hearing officer discount that? There really was no solid evidence put before the hearing officer that this David Schrader person had anything to do with the closure of the school with fraud. It's all just implied now in the briefing that this must have been the case because years later, the Department of Education put out a report which listed what had happened with Mr. Schrader and the school. Is there any evidence in the record here that the criminal case in the late 1990s said, bore in any way or provided any evidence about how the school operated in 1986? I would say the answer is no, Your Honor. It's, to my mind, it's something of a red herring. The really salient point is that both sisters, Laura and Nora, testified before the hearing officer that the school closed in March of 1986, and the parties investigated and the information they put in front of the hearing officer indicated that that was not the case, which obviously bore on the credibility of the witness testimony that the hearing officer had heard. The Schrader, I assume the Schrader, that's the guy who was convicted, that records of that were available? They were. Were they made available to the hearing officer? No, no. In fact, they still haven't been put before the court. I thought they showed the indictment in the record of conviction or public record. They are, but they weren't put before the hearing officer. Have you ever read them? I have not. So on what basis do you respond to my colleague's question by saying there's no relationship between what he was convicted of and what he may have done in Flagstaff with this school? As far as this record is concerned, there is no connection. It would have to be really supposition. You say there's an absence of information about that. Yes, and the plaintiff, Laura, bore the burden of fleshing out the record to carry her burden of proof on the head of household issue. I'd like to go back to my prior question briefly. It looks to me like Martha testified in her hearing that she was selling rugs for $40 to $80 apiece. Nora and Laura testified at their hearing that the rugs were selling for $300 to $600, as I understand it. It looks like there was testimony that they were driving to school for three to six hours a day, which would undercut the ability to generate or make the number of rugs that would add up to $15,000. Laura didn't have any photographs of any of her rugs, whereas Martha did, and it looks like she checked no on a form that O'Neill had issued to her when asking whether or not it was the initial application, I guess, that asked whether or not she made $1,300. However, none of that was in the hearing officer's justification for his credibility findings, correct? I mean, that was all in the record, but I don't think he wrote about any of that. I think that the hearing officer's credibility findings are quite robust. I would point the court to— Well, what's the answer to Judge Murphy's question? I think the hearing officer— In the hearing officer's statement for finding lack of credibility about rug weaving and rug sales, what does he say? I would point the court to ER 19, for example, paragraph 3 of the hearing officer's decision. No credible evidence exists in this record on which to conclude that applicant became a head of household at any time prior to July 7, 1986, as applicant's uncorroborated, unsubstantiated, contradictory, and unreliable testimony about receiving financial aid to attend Arizona Academy and her testimony about earnings from rug sales is not credible and is not supported by any non-testimonial evidence. The evidence is insufficient to conclude that applicant was a self-supporting head of household before the July 7, 1986, deadline. And there are other places of a similar nature in the— Those are the facts, no question about it. I didn't hear any of the facts that I went over in justification. Whether you would agree with that or not, let's assume they were not. Is that a basis on which this panel should send the case back so that the IHO can clear up those specific findings with regard to credibility? Or those factors, I should say. I don't think so, Your Honor, because there's substantial evidence in the record to support the hearing officer's findings, even if you— Let me ask you this question. What if there's substantial evidence, including everything that I just said, it wasn't part of the hearing officer's write-up on the credibility determination and we view that as, say, plain error? Is that a point of law that you're willing to argue at this point? I think— The officer omitted all these things that I just said, but they were in the record. And even though he didn't say it was an error, plain error, there's plenty of corroborating evidence to show— or plenty of evidence to show that she wasn't credible. You know what I'm getting at? Yes, Your Honor. I would say that under the Administrative Procedure Act, there is the rule of harmless error. It's in 5 U.S.C. 706, the final sentence. And I think those kinds of errors, supposing they happened, would be harmless, because the record so clearly establishes that Laura was not entitled to benefits. But if I could push back slightly on, Your Honors, the basis of your questioning. Of course. I would also refer the Court to ER 20, over to page 21, where there is further discussion by the hearing officer about the claimed amounts of the loans that Laura testified she was receiving to attend the Arizona Academy, how that just didn't make sense in terms of the numbers, how it was that the testimony went from being a $5,000 stipend to $10,000 during the course of the questioning. And the hearing officer, after discussing all of this, came to the conclusion, and I quote on ER 21, the incongruity of and discrepancies in applicants' claims about being self-supporting through publicly granted financial assistance during 1985 and 1986 are manifest and self-evident. So I think the hearing officer was quite clear about how he viewed all of the evidence that he had heard. Okay. I have a process question. If you know the answer, fine. If you don't, fine. Please tell me. My understanding from previous cases we've heard involving the same kind of issues is that the very same hearing officer hears all of the cases arising out of the partitioning of land and relocation. Your Honor, that's correct. The agency has had one hearing officer, and it's been the same hearing officer. And to me, that means that he has a great deal of expertise in dealing with these issues. And if I also could offer one… Not the purpose of my question. Here's my question. Does the agency keep records on how often he grants relief and how often he denies it? Yes, Your Honor. And what is that record? As of September of 2023, the agency has certified the majority of the Navajo applications. The numbers are that the agency has certified or granted 3,726 Navajo households for benefits and has denied 3,208 benefit applications. So more than a majority of the applications are being granted. Here, the district court and this court will only hear cases where the agency has denied applications. Where the benefits have been granted, no one's going to complain. It's similar in the immigration process, and we hear lots of cases. Yes, and I suppose the Social Security benefits. If benefits are granted, the grantee is not going to go to court. Thank you. I appreciate it. Sorry to take you over your time. All right, we'll hear rebuttal now from Mr. Phillips. Judge Hawkins, as to your questions about where some of these documents or some of this evidence can be found in the record, there is a considerable number of documents beginning at ER 96 and then further at 181 to 189. These are the records and emails regarding the efforts to try to track down the school. I have 96. It was one of the ones I looked at, but that indicated that it just changed names. That doesn't support the view that it was closed. Well, I think if you look through all of the materials, the conclusion that College of America and the State of Arizona reached was that the school had continued to operate, but under two different groups of people using the same name, same location, and the phone book ad using the same address. And, in fact, they also have in the record the advertisement by Mr. Schrader for a $10,000 scholarship giveaway, financial aid giveaway. And that's exactly consistent with what the women said. They applied for financial aid, $5,000, and living expenses, $5,000. It's not $15,000. It was a total of $10,000. And, again, the information as far as Mr. Schrader's activities is also in the record. There's no clear evidence from I just looked through the pages that that school actually closed. So that was one point he said. They claimed the school closed. The evidence that's available doesn't support that. They changed the number from $5,000 to $10,000 when they got caught that the math didn't add up during the cross-examination. And then they claimed to get aid from the State of Arizona in the form of personal checks. And the hearing officer just said, this is fictitious. I don't believe this because of this kind of stuff. So this isn't just a lack of paperwork. He thought they were lying to him. And why isn't that, under the substantial evidence standard, which is deference, a reasonable ground to say, I just don't believe these people? Well, Your Honor, I don't believe that was the evidence. I don't think that's what the record would show. The record would show, I believe, that the school continued to operate. But, again, in the email communications, I think, is probably where that is discussed. Our conversations with the state and also the College of America they referred us to and then told us that they had never received any records because they have no record of that school being in existence. Again, I want to ask you to review the transcript because this $5,000 changing the story to $10,000 is complete nonsense. I asked Nora Manygoats, how much money did you receive for living expenses? She said $5,000. And that's what both the girls did. $5,000 was the money that Mr. Schrader gave them with personal checks for their living expenses. The other $5,000 was tuition that went directly to Schrader or the school, but neither of the women ever got any of the tuition money. It was sent directly to the school from the financial aid programs. So there was never a change. They always said $10,000. They said in $5,000 increments are living expenses versus tuition. And the only money they got directly was from Schrader, the $5,000, and he paid them on a monthly basis. They were in school before it closed early. They were only in school for about five or six months. September they were in school. On break December, February they weren't in school. They came back in February and they closed in March. So five months basically of school times $900, which is what they testified that they were paid, that's $4,500, and that would be well covered by the $5,000 tuition that the financial programs provided the school. I just want the court to understand that we also provided all of the information on Mr. Schrader. He pled guilty to student loan fraud. Okay, I've allowed you to go over your time. I think we understand the arguments, and so the case just argued will be submitted. Thank you very much, Judge.
judges: HAWKINS, COLLINS, Murphy